## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| STUBBORN MULE LLC, an Oregon limited liability company,<br><br>    Plaintiff,<br><br>v.<br><br>GREY GHOST PRECISION, LLC, an Idaho limited liability company; and GREY GHOST PRECISION, a Washington limited liability company,<br><br>    Defendants. | Case No. 2:22-cv-00399<br><br>**GREY GHOST PRECISION, LLC AND GREY GHOST PRECISION, LLC'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS** |
| GREY GHOST PRECISION, LLC, an Idaho limited liability company; and GREY GHOST PRECISION, a Washington limited liability company,<br><br>    Counterclaimants,<br><br>v.<br><br>STUBBORN MULE LLC, an Oregon limited liability company,<br><br>    Counter-Defendant. | |

Defendants Grey Ghost Precision, LLC and Grey Ghost Precision, LLC (together the "Grey Ghost Precision Entities" or "Grey Ghost Precision") hereby admit, deny, or otherwise respond to the allegations in Plaintiff's complaint against them as follows:

## PARTIES AND JURISDICTION

1.      The Grey Ghost Precision Entities admit that Plaintiff is an Oregon limited liability company with its principal offices in Grants Pass, Oregon, but otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1 and on that basis deny the allegations.

2.      The Grey Ghost Precision Entities deny that there is an entity called "Grey Ghost Idaho". The Grey Ghost Precision Entities admit that there is an entity called Grey Ghost Precision that is an Idaho limited liability company with its principal place of business in Dalton Gardens, Kootenai County, Idaho.

3.      The Grey Ghost Precision Entities deny that there is an entity called "Grey Ghost Washington". The Grey Ghost Precision Entities admit that there is an entity called Grey Ghost Precision that is a Washington limited liability company. The Grey Ghost Precision Entities have insufficient information as to what is alleged by the term "operates" and therefore deny the remainder of the allegations in Paragraph 3.

4.      The Grey Ghost Precision Entities admit that this is an action for breach of contract and that the Court has subject-matter jurisdiction but deny the remainder of the allegations in Paragraph 4.

5.      The Grey Ghost Precision Entities admit the allegations of Paragraph 5.

6.      The Grey Ghost Precision Entities admit the allegations of Paragraph 6.

7.      The Grey Ghost Precision Entities deny the allegations of Paragraph 7.

8.      The Grey Ghost Precision Entities admit that the parties had an agreement for Stubborn Mule to sell firearms parts to the Grey Ghost Precision Entities but deny that Stubborn Mule ever performed its part of the contract by delivering functional parts.

9.      The Grey Ghost Precision Entities deny the allegations of Paragraph 9.

10.     The Grey Ghost Precision Entities admit that they made payments but deny that they ever defaulted on a payment obligation as described in Paragraph 10.

11.     The Grey Ghost Precision Entities deny the allegations of Paragraph 11

12.    The Grey Ghost Precision Entities deny the allegations of Paragraph 12.

13.    The Grey Ghost Precision Entities deny the allegations of Paragraph 13.

14.    The Grey Ghost Precision Entities deny the allegations of Paragraph 14.

15.    The Grey Ghost Precision Entities deny the allegations of Paragraph 15.

16.    The Grey Ghost Precision Entities deny the allegations of Paragraph 16.

17.    The Grey Ghost Precision Entities deny the allegations of Paragraph 17.

18.    The Grey Ghost Precision Entities deny the allegations of Paragraph 18.

19.    The Grey Ghost Precision Entities deny the allegations of Paragraph 19.

20.    The Grey Ghost Precision Entities have insufficient information to form a belief as to the allegations of Paragraph 20 and therefore deny those allegations.

21.    The Grey Ghost Precision Entities have insufficient information to form a belief as to the allegations of Paragraph 21 and therefore deny those allegations.

22.    The Grey Ghost Precision Entities have insufficient information to form a belief as to the allegations of Paragraph 22 and therefore deny those allegations.

23.    The Grey Ghost Precision Entities have insufficient information to form a belief as to the allegations of Paragraph 23 and therefore deny those allegations.

24.    The Grey Ghost Precision Entities deny the allegations of Paragraph 24.

25.    Paragraph 25 is a re-incorporation and no response is required.

26.    Paragraph 26 is a conclusion of law and no response is required. To the extent a response is required, the Grey Ghost Precision Entities deny the allegations of Paragraph 26.

27.    Paragraph 27 is a conclusion of law and no response is required. To the extent a response is required, the Grey Ghost Precision Entities deny the allegations of Paragraph 27.

28.    Paragraph 28 is a conclusion of law and no response is required. To the extent a response is required, the Grey Ghost Precision Entities deny the allegations of Paragraph 28.

29.    Paragraph 29 is a re-incorporation and no response is required.

30.    The Grey Ghost Precision Entities deny the allegations of Paragraph 24.

31.    The Grey Ghost Precision Entities admit that the invoices contain a total but deny that they are obligated to pay any portion of them.

32.    The Grey Ghost Precision Entities deny the allegations of Paragraph 32.

33.    The Grey Ghost Precision Entities admit that Plaintiff sent an email but deny that they are obligated to pay anything.

34.    Paragraph 34 is a conclusion of law and no response is required. To the extent a response is required, the Grey Ghost Precision Entities deny the allegations of Paragraph 34.

35.    Paragraph 35 is a request for relief and no response is required. To the extent a response is required, the Grey Ghost Precision Entities deny the allegations of Paragraph 35.

36.    Paragraph 36 is a re-incorporation and no response is required.

37.    The Grey Ghost Precision Entities deny the allegations of Paragraph 37.

38.    The Grey Ghost Precision Entities admit that the parties are for-profit businesses but deny that Plaintiff reasonably expected payment for delivering faulty goods.

39.    The Grey Ghost Precision Entities deny the allegations of Paragraph 39.

40.    The Grey Ghost Precision Entities deny the allegations of Paragraph 40.

41.    Paragraph 41 is a request for relief and no response is required. To the extent a response is required, the Grey Ghost Precision Entities deny the allegations of Paragraph 41.

42.    The Grey Ghost Precision Entities deny the allegations of Paragraph 39.

43.    The remainder of the complaint is a prayer for relief and no response is required. To the extent a response is required, the Grey Ghost Precision Entities deny that Plaintiff is entitled to any of the relief it seeks.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
### (UNCLEAN HANDS)

44.    Plaintiff's equitable claims for relief are barred, by virtue of the doctrine of unclean hands.

## SECOND AFFIRMATIVE DEFENSE
### (EXISTENCE OF PARTNERSHIP)

45.    Without otherwise admitting the validity of the allegations contained in the claims, the Grey Ghost Precision Entities state that Plaintiff's claims are barred, and/or its alleged damages must be reduced accordingly, as the parties' relationship was governed by an oral partnership agreement, which Plaintiff materially breached, causing significant damages.

## THIRD AFFIRMATIVE DEFENSE
### (LACK OF CAUSATION)

46.    Plaintiff's damages, if any, were not caused by the Grey Ghost Precision Entities.

## FOURTH AFFIRMATIVE DEFENSE
### (PLAINTIFF'S OWN CONDUCT)

47.    Plaintiff is not entitled to relief in this action, as the damages complained of were the result of the Plaintiff's own conduct, or by the conduct of its employees, agents, or other representatives.

## FIFTH AFFIRMATIVE DEFENSE
### (DAMAGES ATTRIBUTABLE TO THIRD PARTIES)

48.    Plaintiff's damages, if any, were caused by one or more actors other than the Grey Ghost Precision Entities, over whom these Stubborn Mule had no authority or control.

## SIXTH AFFIRMATIVE DEFENSE
### (IN PARI DELICTO)

49.    Plaintiff should be barred from recovering against the Grey Ghost Precision Entities under the doctrine of *in pari delicto* because Plaintiff and its representatives are as culpable as, or more culpable than, the Grey Ghost Precision Entities.

## SEVENTH AFFIRMATIVE DEFENSE
### (LACK OF PERSONAL JURISDICTION)

50.    This Court lacks both general and specific personal jurisdiction over the Grey Ghost Precision Entities.

## EIGHTH AFFIRMATIVE DEFENSE
### (FAILURE TO MITIGATE)

51.    Plaintiff's action is barred, or its damages must be reduced accordingly, by virtue of Plaintiff's failure to mitigate its damages.

## NINTH AFFIRMATIVE DEFENSE
### (STATUTE OF LIMITATIONS)

52.     To the extent they were brought outside of the permissible time, Plaintiff's claims are barred by the applicable statute of limitations.

## TENTH AFFIRMATIVE DEFENSE
### (LACHES)

53.     Plaintiff's claims are barred by the doctrine of laches, as Plaintiff delayed asserting its claims for an unreasonable length of time which has resulted in substantial prejudice to the Grey Ghost Precision Entities.

## ELEVENTH AFFIRMATIVE DEFENSE
### (FAILURE TO STATE CLAIM)

54.     Plaintiff has failed to state a claim upon which relief can be granted.

55.     Additionally, the Grey Ghost Precision Entities' investigation into the claims asserted by Plaintiff is ongoing. Defendants reserve the right to assert additional affirmative defenses should they become known at a later date, through the course of ongoing investigation and discovery.

## PRAYER FOR RELIEF

WHEREFORE, the Grey Ghost Precision Entities pray for the following:

1.     For judgment in their favor on all claims asserted against them;

2.     For attorney's fees, costs and expenses incurred in connection with this action as allowed by law;

3.     For such additional relief that this Court may deem just and proper.

## THE GREY GHOST PRECISION ENTITIES' CLAIMS

### INTRODUCTION

1.     Grey Ghost is a series of companies that together are one of the world's premiere manufacturers of firearms, precision shooting equipment, and other firearm-sports related items. The Grey Ghost Precision Entities are part of the Grey Ghost family of companies, specializing in manufacturing firearms.

2.      Dennis Sterling Becklin ("Sterling")[1], is the director and controlling shareholder of a series of companies originally started by his grandfather, including Becklin Industries, which manufactures plastic cases under the DBA ECS. Under Sterling's leadership, the Becklin companies' focus on a small share of the firearms and related equipment market devolved into a series of ill-conceived ventures and half-finished new ideas.

3.      Stubborn Mule is an Oregon company owned by Sheri Johnson. Johnson and Sterling are in a romantic relationship, and much if not all of Stubborn Mule's funding has come from ECS and Sterling.

4.      In 2019, Sterling discussed a potential partnership between Grey Ghost and his companies. As part of that effort, Sterling recruited Grey Ghost employee Casey Ingels to serve as ECS's CEO. Ingels found a disaster. Roles were left unfilled and basic business practices were undone or incompletely or incorrectly done. Ingels spent the next two years bringing in new staff, revising practices, and, with Sterling's enthusiastic support, forging a partnership with Grey Ghost for a number of joint ventures.

5.      But the rot went too deep, and in 2021–22 Ingels found evidence of actual fraud. Sterling and other employees were routinely misusing Becklin Companies' funds for personal purposes, including transferring money to Stubborn Mule to prop up that operation without paying taxes or disclosing the transfers to lenders, misrepresenting the companies' finances to lenders, and using entity funds to buy an Alaskan hunting lodge, other real property, and luxury cars and airplanes, all without, *inter alia*, paying required taxes.

6.      In January 2022 Sterling fired Ingels, making no bones that it was done in retaliation for Ingels identifying fraud. Ingels filed a lawsuit in Oregon, and in retaliation for that Sterling immediately ceased all partnership operations—regardless of whether he was entitled to do so and regardless of Grey Ghost's interest and investment—and embarked on a campaign of

---

[1] Dennis Sterling Becklin is referred to herein as "Sterling" to differentiate him from his father, also named Dennis Becklin.

harassment litigation, including filing claims in Oregon, filing bar complaints, and filing this lawsuit even though the parties were already litigating in Oregon.

7.     The Grey Ghost Precision Entities ask for declaratory relief that the Grey Ghost Precision Entities owe nothing to Plaintiff and seek breach of contract, fraud, breach of fiduciary duties, and other violations of law related to Stubborn Mule's termination of the partnership and tender of false invoices.

## JURISDICTION AND VENUE

8.     This court has jurisdiction under Idaho Code 5-514 (a-b) and because Stubborn Mule has commenced litigation here.

9.     Venue is proper here because Stubborn Mule has commenced litigation here.

## PARTIES

10.     Counter-Plaintiffs the Grey Ghost Precision Entities are an Idaho limited liability company and a Washington limited liability company and a manufacturer of precision rifles, armor plates, custom pistol slides, firearm parts and other accessories. The company is headquartered in Wallace, Idaho. Most Grey Ghost Precision employees have extensive military and/or law enforcement backgrounds, and Grey Ghost Precision regularly sells its products to military and law enforcement personnel throughout the country.

11.     Counter-Defendant Stubborn Mule, is an Oregon limited liability company registered to do business in Oregon, with its principal place of business in Grants Pass, Oregon.

## FACTS COMMON TO ALL COUNTS

**A.     Sterling pursued a partnership with Grey Ghost because the Becklin Companies were in dire financial straits.**

12.     Grey Ghost supplies firearms and equipment to the U.S. military and police agencies throughout the United States and also has a robust share of the private market. Many of Grey Ghost's staff members are former military or police officers and many hold high-level U.S. Government security clearances, enabling Grey Ghost to bid on and fulfill government contracts.

13.     Sterling Becklin is the director and controlling shareholder of a series of companies originally started by his grandfather. Under Sterling's leadership, the Becklin companies focus on a small share of the firearms and related equipment market has devolved into a series of ill-conceived ventures and half-finished new ideas. Included among these ventures was a company called ERA3, which proclaimed it was a "lifestyle with a company wrapped around it" that Sterling wanted people to describe as a combination of "Cars, blades, gear, good booze, better tattoos, glory, resolve, off-roading, scandalous women, badassery." Apparently, what ERA3 actually made was a few pieces of clothing and some knives.

14.     Unsurprisingly, none of these new business ideas worked, and by ignoring the Becklin Companies' core offerings the entire business devolved. Staff roles were left unfilled and staff members had unclear job responsibilities. Basic business practices—like accounting, materials procurement, and order processing—were left undone or done incorrectly.

15.     Because Grey Ghost and the Becklin Companies operated in the same sphere, Sterling knew Grey Ghost's Managing Director, Kathryn Hanson. In 2019-2020, the two discussed the possibility of joint ventures and began exploring the idea of a potential partnership.

16.     Up to early 2020, Casey Ingels was Grey Ghost, LLC and Grey Ghost Precision's CEO. Aware of the challenges faced by the Becklin Companies and his own limitations, in early 2020 Sterling recruited Ingels to become ECS's CEO.

17.     In recruiting Ingels to become CEO of ECS, Sterling considered Ingels' association with Grey Ghost as a positive factor, as Sterling knew that Grey Ghost is a prime contractor with the U.S. Department of Defense and holds a Top-Secret SCI facility clearance – and Sterling wanted to use those resources to help grow ECS's business.

18.     At the start of his tenure as CEO, Ingels quickly learned that ECS's financial outlook was dire. ECS did not have sufficient cash flow to pay its overhead and was approximately $2.5 million short of that requirement. Employees in the accounting department were stealing from the company and providing themselves with loans they never repaid. ECS staff also used corporate credit cards that had only numbers (instead of employee names) assigned to them,

meaning any employee could use any card, making it impossible to track whether the cards were being used for personal expenses.

19.    In addition, ECS had no organizational chart, and its employees had no job descriptions.

20.    Sterling and his father also routinely withdrew money from ECS whenever they pleased. Sterling used ECS revenues to fund an extravagant lifestyle and withdrew money from ECS to purchase two private ranches, an Alaskan hunting lodge, three airplanes, three Porsches, two Ford Raptors, a new Dodge T-Rex, a house in Reno, and two houses in Grants Pass, Oregon.

**B.    The parties agreed to work together as a partnership to salvage ECS and grow all companies' business lines.**

21.    Beginning in May 2020, with Sterling's full knowledge and support Ingels reached out to Grey Ghost and leveraged his relationships in those companies to assist ECS in restructuring its business.

22.    At the time Ingels took over as CEO of ECS in late April 2020, the country was in the midst of the Covid-19 pandemic. Ingels and Sterling both recognized that there was an insufficient pool of local qualified candidates in Grants Pass, Oregon who had the managerial, IT and financial backgrounds needed to assist ECS. Sterling also recognized that ECS needed to be restructured and the employees who were unproductive or stealing from ECS needed to be quickly replaced.

23.    During the next two years, Grey Ghost and ECS shared resources, including employees, and worked together to develop new product lines to grow ECS's business. In addition to personally communicating with Ms. Hanson, Sterling would directly communicate and direct other Grey Ghost representatives, and Sterling routinely sought the advice and assistance from these representatives concerning the expansion of ECS' business and product lines.

24.    With Sterling's active support, Ingels helped grow a deep partnership between Grey Ghost and the Becklin Companies.

C.    **Grey Ghost, ECS, ERA3, and Stubborn Mule's partnership worked jointly to pursue several joint ventures.**

1.    **General Structure of the Partnership**

25.    In March of 2020, Ingels and Sterling jointly identified several business areas that ECS did not have the personnel nor the expertise to address.

26.    The Becklin Companies and Stubborn Mule, through Sterling, and Grey Ghost, through Ms. Hanson, agreed that the Partnership would be for an unlimited duration. The companies would share resources and expenses and would work together to develop several new product lines, including armor, rifles, nylon gear, and a consumer focused "rotomold" line of cases. The profits from these product lines would be split, after accounting for the development costs and initial investment attributable to each company. The companies also shared labor costs, legal expenses, and other related expenses.

27.    Sterling and Ms. Hanson decided that they would be the key individuals for each of their respective companies and directly communicated with each-other regarding the partnership. Jon Jones, as Vice President for Grey Ghost, and Casey Ingels as CEO for ECS, would serve as additional points of contact, to ensure the mutual success of the Partnership.

28.    The intent of all parties was to form a partnership between ECS, ERA3, Stubborn Mule, and the Grey Ghost Precision Entities for the purpose of pursuing the joint ventures detailed below.

29.    Each party agreed to unite their labor, skill, money, and property in furtherance of the partnership.

30.    Partnership decisions were made jointly, with no one party having total control.

31.    The parties shared risks and benefits of the partnership.

32.    Each party contributed financially to the partnership, as described in detail below.

33.    The parties agreed that some Grey Ghost employees would work jointly for ECS and Grey Ghost, with both companies' paying a portion of each such employees' salary.

34.    Pursuant to the partnership and in reliance on the promises made by Mr. Becklin, the Grey Ghost Precision Entities provided skilled personnel in the following areas: accounting,

payroll, human resources, cost accounting, accounts receivable, contracting, account management, sales, shipping, and operations. Grey Ghost also recruited and hired several engineers, including a new Director of Engineering and a new Director of IT and Director of Operations.

35.    Additionally, and pursuant to the Partnership, Grey Ghost conducted numerous interviews of ECS ownership, its business development team, sales team, and operations team. These interviews were conducted to develop a better understanding how ECS was operating, why it was struggling and what areas were ripe for improvement.

36.    Pursuant to the partnership between the companies, Grey Ghost conducted company-wide interviews of ECS employees spanning all the company's business sectors. These interviews were conducted to develop a better understanding of existing ECS business operations to advise company leadership on ways they could realize efficiencies and maximize profitability.

37.    A 22-page after-action report was written and presented to Sterling, based on the findings of Grey Ghost's research analysts covering recommendations for adjustments to business operations in the following areas: sales, project management, engineering, production, and quality.

38.    More specifically, Grey Ghost recommended that ECS terminate several duplicative positions within the company which allowed the company to maximize profitability and that ECS completely overhaul ECS's company structure, specifically in the areas of organization of employees and processes.

39.    Grey Ghost then helped create formal standard operating procedures for ECS employees, which were immediately aligned to the new sales and marketing strategy drafted by Grey Cell, and the recommendations made by Grey Cell's research analysts.

40.    In July of 2020, Ingels, with Sterling's full support, reached out to the Vice President of Grey Ghost to request help in recruiting a competent operations manager to help with instituting the new strategies and processes outlined by Grey Ghost, and to further manage the partnership relations between ECS and Grey Ghost. As a result, Grey Ghost's Vice President

spent 80 hours in July 2020 researching potential candidates, conducting interviews, negotiating

compensation packages, and eventually hiring a qualified candidate on behalf of ECS. Grey

Ghost incurred costs totaling $25,020.00 for these services, which were provided in furtherance

of the Partnership.

41.    In addition, Grey Ghost assisted ECS in recruiting, hiring and onboarding a director

of engineering, mechanical engineer, accounting assistant and director of technical operations,

which positions were vital in order to restructure ECS's business and realize the increased

revenues that ECS ultimately earned under Ingels' stewardship.

### 2.    Partnership joint operations in an armor system, nylon gear line, rotomold line, and consulting operations

42.    Over the ensuing year, Grey Ghost Precision and ECS partnered to manufacture

armor plates, Grey Ghost partnered with ERA3 for a nylon gear line, Grey Ghost partnered with

ECS to manufacture specialty cases, and Grey Ghost's DBA Grey Cell partnered with various

Becklin Companies to expand and grow both parties' consulting and training businesses.

43.    The various ventures met with mixed success. Although Ingels succeeded in

restructuring ECS and Grey Cell managed to get ECS well-positioned for government contracts,

ECS failed to get an operational armor press, ERA3 either refused or was incapable of marketing

the nylon gear Grey Ghost created, and ECS's plastic cases did not sell.

### D.    Grey Ghost Precision agreed to purchase firearms parts from Stubborn Mule as part of the partnership.

44.    During Ingels' time at ECS, it was an open secret that Sterling was having an extra-

marital affair with Sheri Johnson, the owner of Stubborn Mule. Stubborn Mule is a small

company that provides CNC machining services, and during Ingels' time as CEO of ECS,

Stubborn Mule was on the verge of financial collapse.

45.    In fact, during Ingels' employment at ECS, Stubborn Mule's entire payroll was

funded by ECS. At Sterling's direction, ECS transferred over one million dollars of ECS funds to

Stubborn Mule. ECS did not pay any tax on the money it transferred to Stubborn Mule, nor did

Stubborn Mule. Ingels' concerns about the tax liability and his objection to continuing this practice ultimately led to Ingels' unlawful termination.

46.    Sterling envisioned using the Grey Ghost Precision Entities to help his girlfriend's company (Stubborn Mule) launch a designer firearm business. Given Grey Ghost Precision's expertise in manufacturing firearms, Sterling approached Ms. Hanson and asked her to put together a product line that Sterling assured Grey Ghost Precision he would be able to sell.

47.    In March 2021, while developing this rifle line, Sterling informed Ms. Hanson that Stubborn Mule was on the verge of financial collapse. Sterling desperately needed work to send to his girlfriend's company, and both Stubborn Mule repeatedly represented to Ms. Hanson that Stubborn Mule had the capability to machine upper and lower receivers for Grey Ghost Precision, which are rifle components Grey Ghost Precision uses in its rifles.

48.    Sterling asked that Grey Ghost Precision place a large order of upper receivers, lower receivers and handguards with Stubborn Mule, in order to further the Partnership.

49.    Notably, Grey Ghost Precision had the expertise to manufacture all of these rifle components in-house, and only decided to have Stubborn Mule supply these parts due to the ongoing Partnership.

50.    Pursuant to Sterling's request and in furtherance of the partnership, Grey Ghost Precision submitted purchase orders to Stubborn Mule for $1.2 million dollars for upper and lower receivers and rifle handguards. Stubborn Mule accepted the terms set forth on each purchase order.

51.    Grey Ghost Precision provided detailed specifications, processes, and other information regarding the parts requested. That information is trade-secret protected. Grey Ghost Precision takes reasonable measures to keep them secret and provided them to Stubborn Mule for the sole purpose of machining parts for Grey Ghost Precision and as part of the parties' joint effort to develop a new rifle line. Upon information and belief, Stubborn Mule has converted those trade secrets to its own use.

52.    Grey Ghost Precision's Purchase Orders included "release dates", which specified the date Grey Ghost Precision needed to receive the finished part, so that Grey Ghost Precision could meet its own product delivery deadlines. Stubborn Mule failed to meet each one of those release dates, causing Grey Ghost Precision significant damages.

E.    **Stubborn Mule failed to deliver parts meeting required specifications.**

53.    While Stubborn Mule and Grey Ghost Precision began working together in early 2020, it took Stubborn Mule an entire year to competently machine a basic product sample that met Grey Ghost Precision's specifications. Grey Ghost Precision would send drawings of the part it needed, and Stubborn Mule would then machine the part to meet Grey Ghost Precision's desired specifications. Stubborn Mule struggled to meet those basic requirements. Stubborn Mule would produce a sample, Grey Ghost Precision would inspect and discover that it was defective, and Grey Ghost Precision would then explain what needed to be fixed. The parties went through several rounds of this process, and the only reason Grey Ghost Precision continued working with Stubborn Mule during this time period was due to Grey Ghost Precision's business relationship with Sterling's other company, ECS.

54.    Contrary to Stubborn Mule's representations about its proficiency in machining rifle components, the upper and lower receivers that Stubborn Mule shipped were fraught with defects. Approximately 50% of the upper and lower receivers Grey Ghost Precision received suffered from significant defects, which did not meet Grey Ghost Precision's required specifications and quality standards. Ms. Hanson personally communicated with Stubborn Mule about these product defects on numerous occasions, and Stubborn Mule assured Grey Ghost Precision that the defects would be corrected in future shipments. That never occurred.

55.    Not only did Stubborn Mule continue to ship defective parts, but its accounting and record keeping was a disaster. At the start of Grey Ghost Precision's relationship with Stubborn Mule, and as a favor to Sterling, Grey Ghost Precision paid for the parts it ordered in advance, which is virtually unheard of in the firearm industry. Unfortunately, Stubborn Mule had no idea how to properly account for these pre-payments and apply credits to the invoices it later issued to

Grey Ghost Precision. In a September 7, 2021 email from Sterling to Ms. Hanson, Sterling assured Grey Ghost Precision that Stubborn Mule would "figure it out" – but that never occurred.

56.    In addition, the parties' agreed that any invoices sent to Grey Ghost Precision would be on Net 30 payment terms. Contrary to that agreement, Stubborn Mule continued to invoice Grey Ghost Precision on a Net 15 basis – and then demanded interest based on those Net 15 terms that were in violation of the parties' agreement.

57.    Grey Ghost Precision returned the defective upper and lower receivers to Stubborn Mule, to either be re-worked or replaced. Many of these defective parts were never fixed and returned to Grey Ghost Precision, yet Stubborn Mule continued invoicing Grey Ghost Precision for those products.

58.    In an attempt to salvage the business relationship, Grey Ghost Precision began its own efforts to correct Stubborn Mule's manufacturing defects. This additional work included: drilling door rods on all AR15 uppers, sanding tooling marks from handguards, and reworking AR10 and AR15 sets to meet the required tolerances and specifications. Additionally, Grey Ghost Precision was not able to fix many of the upper and lower receiver sets that Stubborn Mule delivered. Grey Ghost Precision was forced to sell these defective receivers separately for less than Grey Ghost Precision otherwise would have, because the upper and lower receivers did not fit together properly.

59.    The defects with Stubborn Mule's parts were never fully corrected and it forced Grey Ghost Precision to miss its own product delivery deadlines, as well as incur substantial costs to correct those defects.

## F.    Sterling terminated Ingels and abandoned all joint ventures after Ingels identified fraud in the Becklin Companies revolving around Stubborn Mule.

60.    Ingels eventually discovered that Sterling and his father had pledged approximately $13 million worth of their ECS shares as collateral for various loans. To conceal their self-dealing from these lenders, the Becklin family used two accounting systems, one of which was created to conceal this activity and could be shared with bank and government auditors. This

second set of books – which did not accurately reflect the financial condition of ECS – was shared with the Becklins' lenders in violation of state and federal law.

61.    In a January 26, 2022 email from Ingels to Sterling, Ingels expressed his concern that ECS, at Sterling's direction, prepared financial statements that falsely represented that Sterling's girlfriend had equity in Stubborn Mule, when, in fact, she had not contributed equity; rather she had simply received pay, benefits and infusions of capital from ECS. Ingels also detailed his concerns that Stubborn Mule continued to have enormous losses and warned of "substantial exposure," referring both to tax and other legal liability arising from Sterling's misuse of ECS funds to prop up his girlfriend's failing business, and the obvious conflict of interest and breaches of fiduciary duties that these transactions represented.

62.    Ingels also expressed concern that ECS and Sterling were violating state and federal tax laws, as neither ECS nor Stubborn Mule were paying proper taxes on the funds transferred from ECS to Stubborn Mule.

63.    Incensed that Ingels raised these concerns about Sterling and Sheri Johnson's relationship and ongoing tax fraud, Sterling immediately fired Ingels as CEO of ECS, and then directed the entities under Sterling's control, including ECS, Stubborn Mule and ERA3, to immediately cease all cooperation with the Grey Ghost Precision Entities and the Partnership.

**G.    After the Grey Ghost Precision Entities cancelled the contract, Stubborn Mule sent fraudulent invoices for parts it never delivered or manufactured.**

64.    On February 9, 2022, Grey Ghost Precision formally notified Stubborn Mule that Grey Ghost Precision was cancelling all open purchase orders immediately, due to Stubborn Mule's repeated failure to deliver parts that met Grey Ghost Precision's specifications and quality standards.

65.    On February 28, 2022, Sheri Johnson emailed Grey Ghost Precision a "statement" which included ten (10) new invoices all dated February 1, 2022, and three (3) new invoices dated February 24, 2022.

66.     The invoices were fraudulent and sought payment for parts that were never manufactured or delivered to Grey Ghost Precision.

67.     On March 9, 2022, Grey Ghost Precision responded to Ms. Johnson's email and advised her that Grey Ghost Precision never received the products included in Stubborn Mule's newly created February 1 and February 24, 2022 invoices. Grey Ghost Precision also asked Ms. Johnson to provide the tracking numbers evidencing that the product was actually shipped to Grey Ghost Precision, or otherwise provide more information as to why Stubborn Mule was sending Grey Ghost Precision thirteen new invoices after Grey Ghost Precision terminated the parties' relationship.

68.     Stubborn Mule never provided the requested tracking information showing that these parts were shipped to Grey Ghost Precision, nor did Stubborn Mule ever attempt to explain what these new invoices were for. Had Stubborn Mule actually shipped those parts to Grey Ghost Precision, this information would have been easy for Stubborn Mule to provide, as it routinely provided such tracking information in its prior invoices.

69.     Stubborn Mule also refused to provide the serial numbers (which are required under federal law) for those products, and it refused to provide Grey Ghost Precision with any information supporting its position that those products contain Grey Ghost Precision's designs or specifications.

70.     Beginning in March 2022 and continuing for several months thereafter, Stubborn Mule falsely represented that these invoices were legitimate and continued to demand payment for these invoices, knowing full well that the invoices were fraudulent.

71.     Since approximately March 2022 and continuing thereafter, Stubborn Mule has also disseminated these false invoices to Grey Ghost Precision's other subcontractors and suppliers, to convince those third parties to cease conducting business with Grey Ghost Precision. Stubborn Mule has falsely represented to these third parties that Grey Ghost Precision is untrustworthy and does not pay for product deliveries.

72.    By intentionally disseminating these false invoices, Stubborn Mule has intentionally harmed Grey Ghost Precision's business credit rating, causing additional damages.

**FIRST CAUSE OF ACTION**
**(BREACH OF PARTNERSHIP AGREEMENT)**

73.    The Grey Ghost Precision Entities incorporate and reallege the above paragraphs as if fully set forth herein.

74.    The Grey Ghost Precision Entities and Stubborn Mule entered into an oral partnership agreement. The Grey Ghost Precision Entities performed their obligations under the Partnership which included investing considerable sums of money and resources toward developing new product lines and agree to pay for firearm parts the Grey Ghost Precision Entities did not need to purchase.

75.    Stubborn Mule breached the terms of the Partnership, by failing or refusing to carry out acts which would benefit the partnership, which included, but were not limited to the following:

      a.    Stubborn Mule failed to dedicate sufficient resources to developing the firearm line.

      b.    Stubborn Mule failed to devote adequate resources to producing components and thus produced defective components and fraudulently overbilled for components.

      c.    Stubborn Mule converted partnership property to its own use.

76.    The Grey Ghost Precision Entities spent considerable sums of money during the product development phase of these projects and also invested considerable sums of money in providing Stubborn Mule with consulting services.

77.    As a direct and proximate result of Stubborn Mule's conduct, the Grey Ghost Precision Entities have suffered significant damages, including, but not limited to, the loss of their investment in the Partnership, payment to Stubborn Mule for defective products, lost profits and other expectancy damages to be proven at trial.

## SECOND CAUSE OF ACTION
### (BREACH OF CONTRACT)

78.     The Grey Ghost Precision Entities incorporate and reallege the above paragraphs as if fully set forth herein.

79.     The Grey Ghost Precision Entities and Stubborn Mule had a contract for Stubborn Mule to deliver parts.

80.     The Grey Ghost Precision Entities fulfilled or is excused from fulfilling all of its obligations.

81.     Stubborn Mule breached its obligations.

82.     The Grey Ghost Precision Entities were harmed.

## THIRD CAUSE OF ACTION
### (FRAUD)

83.     The Grey Ghost Precision Entities incorporate and reallege the above paragraphs as if fully set forth herein.

84.     Stubborn Mule sent invoices to Grey Ghost Precision demanding payment for items that were not delivered, and for prices and on terms that were not agreed.

85.     The invoices and Stubborn Mule's statements about them are representations that were false when made.

86.     Stubborn Mule knew they were false when made.

87.     Grey Ghost Precision, through its accounting department, relied on the statements and made payments that Stubborn Mule was not entitled to receive.

88.     Grey Ghost Precision reasonably relied on the statements because Stubborn Mule was a business partner and Grey Ghost Precision had no means to verify the statements on the short timeframe Stubborn Mule demanded.

89.     As a proximate cause of these statements, Grey Ghost Precision was harmed in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### (DEFAMATION)

90.    The Grey Ghost Precision Entities incorporate and reallege the above paragraphs as if fully set forth herein.

91.    Stubborn Mule made statements to the Grey Ghost Precision Entities' customers, potential customers, suppliers, and other actual and potential business relationships about at least the following items:

- The Grey Ghost Precision Entities' indebtedness and failure to pay invoices issued by Stubborn Mule.

- The Grey Ghost Precision Entities' breach of contract.

- The Grey Ghost Precision Entities' failure to contribute to the partnership.

92.    Each of those statements was false and defamatory.

93.    The Grey Ghost Precision Entities were harmed because of the statements.

## FIFTH CAUSE OF ACTION
### (TORTIOUS INTERFERENCE)

94.    The Grey Ghost Precision Entities incorporate and reallege the above paragraphs as if fully set forth herein.

95.    The Grey Ghost Precision Entities have actual and prospective economic relationships with customers, suppliers, contractors, and others.

96.    Stubborn Mule intentionally interfered with those relationships, including by disseminating false information about the Grey Ghost Precision Entities and the parties' relationship and cessation thereof.

97.    Stubborn Mule did so through improper means and for the improper purpose of causing economic harm to the Grey Ghost Precision Entities and economic advantage to themselves.

98.    The Grey Ghost Precision Entities were damaged and there is a causal effect between Stubborn Mule's actions and that harm.

## SIXTH CAUSE OF ACTION
## (DECLARATORY JUDGMENT)

99.    The Grey Ghost Precision Entities incorporate and reallege the above paragraphs as if fully set forth herein.

100.    There is an actual and substantial controversy between the Grey Ghost Precision Entities and Stubborn Mule as to whether the Grey Ghost Precision Entities must pay fraudulent invoices issued by Stubborn Mule.

101.    The parties have adverse legal interests.

102.    The Court can resolve the controversy through a binding decree, specifically a declaration that the Grey Ghost Precision Entities are not required to pay the invoices.

## SEVENTH CAUSE OF ACTION
## (UNJUST ENRICHMENT)

103.    The Grey Ghost Precision Entities incorporate and reallege the above paragraphs as if fully set forth herein.

104.    The Grey Ghost Precision Entities conferred a substantial benefit to Stubborn Mule, which included product development, market research and analysis and investment in developing a new rifle system and valuable industry-specific consulting services, as well as payments for defective or never-received parts.

105.    At all times material hereto, Stubborn Mule was aware that it was receiving these benefits from the Grey Ghost Precision Entities.

106.    Stubborn Mule has refused to compensate or reimburse the Grey Ghost Precision Entities for the value of the services provided.

107.    Under the circumstances, it would be unjust to allow Stubborn Mule to retain the benefit of the services described in this Complaint, without compensating the Grey Ghost Precision Entities for same.

108.    Stubborn Mule has been unjustly and knowingly enriched at the Grey Ghost Precision Entities' expense, in an amount to be proven at trial.

109.  As a direct and proximate result of Stubborn Mule's conduct, the Grey Ghost Precision Entities have incurred substantial damages in an amount that will be proven at trial.

## EIGHTH CAUSE OF ACTION
### (FRAUD)

110.  The Grey Ghost Precision Entities incorporate and reallege the above paragraphs as if fully set forth herein.

111.  Stubborn Mule repeatedly represented to the Grey Ghost Precision Entities that Stubborn Mule had the expertise and capability to machine upper and lower receivers as well as rifle handguards.

112.  Stubborn Mule asked that Grey Ghost Precision place a large order of rifle components with Stubborn Mule, in order to further the ongoing Partnership. Stubborn Mule also requested, and Grey Ghost Precision ultimately paid for the parts it ordered in advance. The only reason Grey Ghost Precision made such a large prepayment was based on Stubborn Mule's representations about Stubborn Mule's capabilities.

113.  Pursuant to that request and based on Stubborn Mule's representations, Grey Ghost Precision submitted a Purchase Order to Stubborn Mule for $1.2 million dollars.

114.  The representations made by Stubborn Mule concerning Stubborn Mule's expertise, its experience concerning the machining of rifle components, and its ability to meet Grey Ghost Precision's delivery timeframes were false, and they were known by Stubborn Mule to be false when they were made.

115.  In reality, Stubborn Mule's abilities were so lacking that it took Stubborn Mule an entire year to competently machine a basic product sample that met Grey Ghost Precision's specifications. The parts that Grey Ghost Precision later received were not received on time, and those products that Grey Ghost Precision received did not meet the product specifications.

116.  The Grey Ghost Precision Entities reasonably relied on Stubborn Mule's representations because they had no way to verify them and no reason to disbelieve.

117.  The Grey Ghost Precision Entities actually relied on the representations.

118. As a direct and proximate result of Stubborn Mule's representations, the Grey Ghost Precision Entities have incurred substantial damages in an amount that will be proven at trial.

## TENTH CAUSE OF ACTION
## (MISAPPROPRIATION OF TRADE SECRETS)

119. The Grey Ghost Precision Entities incorporate and reallege the above paragraphs as if fully set forth herein.

120. Stubborn Mule acquired, disclosed, and used trade secrets belonging to the Grey Ghost Precision Entities.

121. Stubborn Mule did so using improper means.

122. The Grey Ghost Precision Entities were harmed.

## PRAYER FOR RELIEF

WHEREFORE, the Grey Ghost Precision Entities pray for the following relief:

1. Judgment in their favor on all claims asserted against Stubborn Mule herein;

2. Economic damages in an amount to be determined at trial;

3. Prejudgment interest at the statutory rate;

4. Attorneys' fees, costs, and expenses incurred in connection with this action as allowed by law; and;

5. Such other and further relief as the Court may deem just and appropriate.

## DEMAND FOR JURY TRIAL

The Grey Ghost Precision Entities hereby demand a jury trial as to all claims and issues triable of right by a jury.


Dated this 29th day of November, 2022.    Respectfully submitted,

BISTLINE LAW, PLLC

Arthur M. Bistline

NEWMAN DU WORS LLP

/s/ John Du Wors
_____
John Du Wors, *pro hac vice*
Keith Scully, *pro hac vice*

Counsel for Defendants and Counterclaimants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the November 29, 2022, I electronically filed the foregoing document with the U.S. District Court. Notice will automatically be electronically mailed to the following individuals who are registered with the U.S. District Court CM/ECF System:

- Robert A. Faucher          RFaucher@hollandhart.com
  HOLLAND & HART LLP

- Scott R. French           SRFrench@hollandhart.com
  HOLLAND & HART LLP

/s/ Erika Cueva
Erika Cueva